Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Arlander Keys | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 3229 | **DATE** | 3/4/2004 |
| **CASE TITLE** | Scott Mohr and Sally Mohr vs. American Automobile Insurance Co. | | |

**MOTION:**   [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due ___ ___.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Memorandum Opinion and Order entered. The Court held a bench trial in this case on January 5 - 7, 2004. Based upon the evidence presented, the Court finds for the Plaintiffs on Count One of their Complaint, and directs the Clerk to enter judgment in their favor in the amount of $15,000.00. The Court finds for the Defendant on Counts Two and Three. *AK*

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | *3* | | Document Number |
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | MAR 0 5 2004 | | |
| | Docketing to mail notices. | | date docketed | | 53 |
| ✓ | Mail AO 450 form. | | GrA | | |
| | Copy to judge/magistrate judge. | | docketing deputy initials | | |
| | | | 3/4/2004 | | |
| FT/*Decy* | courtroom deputy's initials | | date mailed notice | | |
| | | | FT | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SCOTT MOHR and SALLY MOHR,          )
                                    )
                Plaintiffs,         )     No. 01 C 3229
                                    )
        v.                          )
                                    )     Magistrate Judge
AMERICAN AUTOMOBILE INSURANCE       )     Arlander Keys
COMPANY,                            )
                                    )
                Defendant.          )

**DOCKETED**

**MAR 0 5 2004**

### MEMORANDUM OPINION AND ORDER

Scott and Sally Mohr resided in a beautiful, fairytale-esque
Cotswold-style home in Lake Forest, Illinois.  After the roof of
their home was damaged during a hail storm, they filed a claim
with their homeowners insurance carrier, American Automobile
Insurance Company ("AAIC"), one of the Fireman's Fund Insurance
Companies.  AAIC determined that any hail damage caused to the
roof could be fixed for $15,000, and offered to settle the matter
for that amount.  The Mohrs, who were looking for $400,000 (which
was not quite what it cost to replace the roof), sued, seeking a
declaratory judgment, as well as damages for breach of contract
and for violation of §155 of the Illinois Insurance Code.  The
parties consented to proceed before a United States magistrate
judge, and the Court held a bench trial on January 5, 6 and 7,
2004.  The following opinion constitutes the Court's findings of
fact and conclusions of law pursuant to Rule 52(a) of the Federal

53

Rules of Civil Procedure.[1]

FINDINGS OF FACT

A.   Background

Scott and Sally Mohr previously lived in a charming, 4,400+ square foot, Cotswold-style home located at 730 N. Mayflower Road, a prestigious corner in the prestigious suburb of Lake Forest, Illinois. They bought it in 1990 for $1.75 million. The home, which is undeniably lovely and impressive, features a unique rolled cedar shingle thatched roof; by all accounts, the roof, designed to look like the type of thatched roof one might find in the English countryside (though presumably on a less grand scale), is the home's distinguishing characteristic and a large part of why the home is worth so much.

The Mohrs lived in the home from May of 1990 until July 2000, when they moved to New Jersey. During their tenure there, they did a number of renovation projects, including an addition, built in 1998/1999, that required the creation of a new roof section; that section was designed and installed to tie in perfectly with the existing shingle layout. The nature of this particular roof unquestionably made repair and renovation projects tricky. First, cedar shingles in general change color

---

[1]To the extent certain findings may be deemed conclusions of law, they shall also be considered conclusions. Similarly, to the extent matters contained in the conclusions of law may be deemed findings of fact, they shall also be considered findings.

2

as they age and become weathered. So new shingles would stand out from the old for a time. But, more significantly, to achieve the thatched roof appearance that made this house so unique, the shingles had to be cut, placed and inserted in a specific manner, and, in some areas of the roof, the shingles had to be steam bent before placement. In other words, the installation and maintenance of this roof required expertise beyond what might be possessed by the average roofer, even the average roofer who occasionally deals with cedar shingle roofs.

In early 2000, because of Mr. Mohr's job, the Mohrs decided to sell their home and move to the east coast. At about the same time, the Mohrs received a letter from Craig and Jane Omvedt, who had recently moved to the Lake Forest area. In their letter, the Omvedts indicated that, if the Mohrs ever decided to sell their home, the Omvedts would be interested in buying it. In April of 2000, the Mohrs signed a contract to sell their home to the Omvedts for $3.3 million. The transaction was set to close on July 11, 2000.

On May 17, 2000 – that is, after the contract was signed but before the deal was closed – a hail storm hit the Lake Forest area. By all accounts, the storm was historic in magnitude, causing property damage throughout the area. The Mohrs' home was no exception; following the storm, the roof was pock-marked with white spots from where the hail had hit the roof. In addition,

there were cracks and splits in roof tiles that were later determined to be directly attributable to the hail. Just how many tiles were damaged by hail is hotly contested by the parties, and the Court makes specific findings concerning the extent of the damage below.

Immediately following the storm, the Mohrs did nothing with respect to the roof. Mr. Mohr initially felt no need to file a claim on the roof because he thought the bulk of the damage – the pockmarks caused when the hail hit the roof – would go away. At some point, in the days leading up to the closing, the Omvedts saw the roof and told the Mohrs that they were concerned about its condition. On the day of the closing, the Omvedts advised the Mohrs, who had already purchased a home in New Jersey and moved their belongings out of the Mayflower Road house, that they would not close the deal unless the Mohrs agreed to set up a $400,000 escrow account to cover the expense of dealing with the roof. The Mohrs, who were obviously over a very large barrel, succumbed to the Omvedts' demand. And then the Mohrs called AAIC to try to recover, under their homeowners insurance policy, whatever money actually had to be paid out of the escrow.

Randall Christensen, an adjuster for Fireman's Fund, was assigned to handle the Mohrs' loss claim. On July 12, 2000, Mr. Christensen went to the home to check out the roof; he was accompanied by his expert, Chris Kneppers, an engineer, certified

4

professional estimator and registered roofing consultant. The two inspected the roof, primarily from the ground, though Mr. Kneppers did climb on to the roof in a couple of places, and then Mr. Kneppers prepared a report concerning the damage. In his report, Mr. Kneppers stated that the roof was "in a generally good condition with relatively few splits and cracks in the shingles." Plaintiffs' Exhibit 8. He noted several exceptions, however.

First, Mr. Kneppers noted that the shingles at the roof ridge area were loose, damaged and deteriorated for an average of seven courses[2] from the ridge. Second, on the south elevation, he noted that approximately two square feet of shingles were compressed or destroyed. *Id.* Third, he noted that, in the roof area covering the 1998/1999 addition, the copper ridge was pitted and the shingles in the area where the addition tied in to the original roof were deteriorated. *Id.* Mr. Kneppers concluded in his report that, based upon his observations, he believed the roof "may be restored to its pre-loss condition by addressing the areas of damage at the ridges and the dormer on the South

---

[2]A course is a line or row of shingles. Tr. at 377, 527. The courses are built up, with one line laying upon the next and so on. The part of the shingle in a given course that sticks out from under the course above it is called the exposure. On a standard shingle roof, the exposure remains pretty much constant at 5.5 inches for an 18-inch shingle and 5 inches for a 16-inch shingle. Tr. at 527. On the Mohrs' roof, the exposure varied greatly, from as little as one inch to as much as 5.5 inches. Tr. at 377.

Elevation, and other isolated areas where shingles are noted to be missing or damaged." *Id.* He further stated that such repairs should not exceed $15,000. *Id.*

On August 1, 2000, Mr. Christensen wrote to the Mohrs' attorney, advising that, based on his inspection of the roof, and based on Mr. Kneppers' report, AAIC would "offer to pay the cost to repair the hail damage[d] areas of the roof [in an amount that] should not exceed $15,000." Plaintiffs' Exhibit 16.

Upon receiving the report, the Mohrs' attorney, Robert Kuker, obtained his own expert to advise him about whether repairs were appropriate, or whether the roof needed to be replaced, as Cedar Roofing and Mr. Omvedt had determined. Mr. Kuker retained as his expert John Robert Madro, the president and owner of Timberline Cedar Werks, a cedar roofing company operating in and around the Lake Forest area and the north shore. Mr. Kuker and Mr. Madro inspected the roof on October 31, 2000, and Mr. Madro prepared a report on November 15, 2000. In his report, Mr. Madro noted that the roof had extensive hail damage, including hail impact marks throughout, countless splits and holes caused by those impacts, as well as a lot of missing shingles. *See* Plaintiffs' Exhibit 3. Based on his findings, Mr. Madro recommended that the entire roof be replaced. He explained that "spot repairs" were simply not feasible:

> This is not a roof that can be repaired easily as the roofing process involves building up layer upon layer

of steam bent shingles.  You can't just pull out a
damaged shingle and replace it.  To repair one shingle
you may have to replace as many as 50 shingles to blend
it properly.  At this point the damage is so extensive
that the number of shingles that would need to be
replaced could not be calculated.  The process of
trying to do this would be extremely time consuming and
would continue on to an unforeseen amount of shingles.
. . . The complete roof is patterned with wave lines
that flow like a large jigsaw puzzle.  This type of
repair could cost many times the replacement cost of
this roof and getting the pieces of this puzzle in
place would be very difficult if not impossible under
this type of large repair project.  In addition after
doing a repair of this magnitude you would end up with
a patchwork roofing system, which would be
unwarrantable.

Plaintiffs' Exhibit 2.

Given their experts' opposing viewpoints, the parties were

essentially at a stalemate, and, in the end, the Mohrs sued.

Their complaint, filed on May 3, 2001, sought a declaratory

judgment that the policy AAIC issued to the Mohrs covers the hail

damage loss, and that AAIC is required to pay the amount

reasonably necessary to replace the roof on the Mohrs' home.  The

Mohrs also alleged that AAIC breached the insurance contract by

refusing to pay to replace the roof, and that AAIC's refusal to

pay the reasonable cost of replacing the roof constitutes

vexatious and unreasonable conduct, in violation of §155 of the

Illinois Insurance Code.

B.    The Trial

The Court held a bench trial in the case on January 5, 6 and

7, 2004.  At trial, the Mohrs presented extensive evidence

7

concerning the damage to the roof. First, Mr. Mohr testified concerning the condition of the roof before and after the storm. At the outset, Mr. Mohr explained that the roof of this house is unique, and that it is THE distinguishing feature of the house. Tr. at 13-14. Mr. Mohr testified that he checked out the roof within a day or two of the storm, when he returned home from a business trip. He said he noticed "that the roof was pockmarked from the [hail] stones." Tr. at 16. And that "there were broken shingles along the edge of the . . . house." Id. Mr. Mohr testified that he saw about 15 shingles on the ground that were so broken that they could not be repaired, so he just threw them out. Tr. at 50. He testified that the pockmarks were the most "distinguishing damage"; the shingles, which take on a gray appearance when weathered, were dotted with white pockmarks. Id. Mr. Mohr testified that he could not tell whether the pockmarks were simply surface marks or discolorations, or whether the shingles were actually dented where the marks were visible. Id. at 50-52. Mr. Mohr testified that he did not recall seeing any damage to the gutters or the downspouts, or the stucco on the sides of the house. Id. at 52-53. He also testified that, although there were some pockmarks on the garage roof, the damage there was not nearly as significant as it was on the main house. Id. at 53. Despite the damage, Mr. Mohr testified that they did not have any leaking after the storm. Tr. at 54.

8

On cross examination, Mr. Mohr admitted that problem areas existed on the roof before the storm. He testified that shingles on one section of the roof had been damaged by his son playing hockey and throwing balls against the roof, and that one other section was covered by a patch of moss. Tr. at 41-42. Additionally, Mr. Mohr admitted that, at the time of the storm, the roof was already at least twenty years old; it had last been replaced in the late 1970s. *Id.* at 41.

Mrs. Mohr similarly testified[3] that the damage to the roof consisted of cracked and missing shingles, plus the pockmarks. She testified that, within a short period after the storm, she noticed numerous cracked or missing shingles on the back side of the house, high up on the roof. Tr. at 197, 206. She testified that the damage may have involved as few as 20 to 50 shingles, or as many as 100 or 200 shingles; there were "a mess of them up there." Tr. at 197, 208. She also testified that the roof, overall, appeared dimpled or pocked. Tr. at 196, 207. She testified that thousands and thousands of the shingles were pocked and marred, that "[t]here were big marks all over [the roof]." Tr. at 208.

The plaintiffs also presented the testimony of two roofing contractors who specialize in cedar roofs. First, the plaintiffs

---

[3]Mrs. Mohr was unavailable for trial. But the parties read excerpts from her deposition into the record.

presented John Matt Wilkinson, the president and owner of Cedar
Roofing Company, a residential roofing company operating in and
around the Lake Forest area and the north shore.  Mr. Wilkinson
testified as both a fact witness and an expert witness.  He was
familiar with the roof, having done the roof work for the Mohrs'
1998/1999 addition, and having inspected the roof after the storm
at the request of Mr. Omvedt.  In addition, Mr. Wilkinson has
more than twenty years of experience as a roofer, more than half
of which involves work with cedar shakes or shingles.  Mr.
Wilkinson and his company ultimately replaced the roof for the
Omvedts and were paid out of the escrowed funds.

On direct examination, Mr. Wilkinson initially echoed the
Mohrs' sentiment that this roof, which he characterized as a
thatched cedar shingle roof, was truly unique; there were maybe
four or five houses in the area with this type of roof.  Tr. at
233.  With respect to hail damage to the roof, Mr. Wilkinson
testified that he inspected the Mohrs' roof on July 7, 2001,
after being asked to do so by Mr. Omvedt, and initially saw
evidence of hail marks all over the roof, as well as broken and
loose shingles, denting in the gutters and discoloration of the
shingles.  Tr. at 249.  After conducting a more thorough
investigation, going out to the property on several additional
occasions and crawling all over the roof looking for damage and
doing specific tests in designated areas to assess the damage,

10

Tr. at 250, Mr. Wilkinson noted the following:

(1) on the area of the roof that had been added by Cedar Roofing in 1998 and 1999, Mr. Wilkinson noted that the copper ridge at the top of the roof was dented throughout, the gutters were dented, and the shingles were discolored; he testified that he did not recall seeing any splits or cracks on that part of the roof. Tr. at 253.

(2) the detached garage showed discoloration and hail marks throughout, and there were splits or cracks on roughly 10 to 20% of the shingles there. Tr. at 254.

(3) on the older sections of the roof (the sections that existed before the 1998/1999 addition), he noticed splitting and cracking in shingles more predominantly near the peak of the roof, Tr. at 255; there were dents in the shingles, which he likened to stress fractures in that the dents compromise the structural integrity of the shingles, and make them more vulnerable to cracking in the future. *Id.* at 256.

(4) he and his crew estimated that there were 7 to 20 broken shingles per square[4] in some areas, 12 to 20 broken shingles per square in other areas, and that in other areas, particularly up near the ridge, that number was much greater. Tr. at 321.

(5) he also saw damage on the gutters and downspouts; he

---

[4]A "square," a measurement commonly used by roofers, is a ten-foot-by-ten-foot area on a roof. *See, e.g.*, Tr. at 235. A typical square contains roughly 400 to 600 shingles. Tr. at 537.

testified that he saw severe dimpling and dents over 80 to 90% of the gutter system. Tr. at 270.

With respect to the dimpling and discoloration (what the Mohrs described as pockmarks) caused by the hail, Mr. Wilkinson testified that, although some of the discoloration will eventually fade out, he nonetheless considers these to be damage for two reasons. First, he explained, there is an aesthetic aspect to the damage: the marks changed the appearance and coloration of the roof, in the short term, to an extreme degree, and, over time, to a lesser degree. Second, Mr. Wilkinson explained that quite a few of the dimples were actually dents or compression marks, not just surface discoloration, and that these dents weaken the structural integrity of the shingles. Tr. at 294, 256, 299.

Based on the amount of damage he saw − the split and missing tiles throughout the roof, as well as the dents and pockmarks − Mr. Wilkinson testified that he advised the Omvedts to replace the entire roof, rather than attempt to spot repair the damaged shingles. Tr. at 263, 332. Mr. Wilkinson testified that he recommended replacing the roof because the cost of spot repairs, which are extremely tricky on this type of roof and often cause more damage to surrounding shingles, would greatly exceed half the cost of a new roof, which was his threshold for deciding the repair versus replace question. Tr. at 264. He also testified

12

that, because of the way cedar shingles weather, spot repairs, which would have had to have been done in various sections all over the roof, would have given the roof a patchwork effect, diminishing the overall appearance of the house.  Tr. at 316.

Finally, Mr. Wilkinson testified that the work he ultimately did on the house ended up costing a little more than $382,000. He testified that Mr. Omvedt was quite particular about the way he wanted the roof installed, and that each time they discussed the project, the price would go up based upon specific ideas and requirements that Mr. Omvedt imposed upon the roofers.  Tr. at 286-87.

After Mr. Wilkinson, the Mohrs called John Robert Madro to testify.  Mr. Madro is the president and owner of Timberline Cedar Works, a cedar roofing company operating, primarily, in and around the north shore.  Mr. Madro, like Mr. Wilkinson, testified as both a fact witness and an expert witness; he has almost thirty years of experience working on cedar shake and shingle roofs, he has repaired cedar roofs countless times, he has personally evaluated cedar roofs for hail damage about 1,500 times, and he has personally evaluated cedar roofs for the express purpose of determining whether they need to be repaired or replaced 3,000 to 4,000 times.  In addition, he personally inspected the Mohrs' roof in November 2000, at the request of the Mohrs' attorney.

In his testimony, Mr. Madro echoed the testimony of all the other witnesses that this roof was not just any roof. He characterized it as "a cedar shingle thatch style or cottage style roof, which is a custom hand-laid steam bent shingle, a very time-consuming, very intricate type of cedar shingle roof." Tr. at 354. Mr. Madro testified that, when he inspected the roof, in November of 2000, he found hail impact marks throughout the entire roof system, on every plane; he also found split shingles on every section of the roof he examined. Tr. at 357, 368-69. He testified that he saw dents in the copper flashing and in the copper gutters; he saw damage to the copper ridge on the roof, which, in his opinion, needed to be replaced to bring the roof back to its pre-storm condition. Tr. at 371. Mr. Madro noted missing shingles and holes that had been caused by the hail blowing through the shingles. *Id.* at 357. And he testified that he saw shingles with damaged butt ends throughout the roof. *Id.* at 373. Mr. Madro testified that, based on his assessment of the damage, replacement of the entire roof, rather than spot repair, was the proper course of action. Tr. at 364. He explained that damage existed on every part of the roof and that, as a result, the "spots" to be spot repaired were not definable; he testified that it would have been impossible to just arbitrarily pick a "spot" and say the repairs should stop there. *Id.* at 380.

Mr. Madro testified, consistent with Mr. Wilkinson, that

14

hail impact marks could constitute damage in that the impact
could split the shingle or cause a "stress crack." Tr. at 367.
He later clarified, on cross examination, that he did not
necessarily consider the pockmarks themselves to be damage, but a
possible indicator of damage. Tr. at 406. On cross examination,
he admitted that he is unaware of any study showing that dents
from hail impair the structural integrity of a cedar shingle.
Indeed, he admitted that he is aware of one study, done by Haag
Engineering, showing that dents from hail do not damage a cedar
shingle; he admitted that he is also aware that the Cedar Shake
and Shingle Bureau, a quasi-governmental body that rates and
regulates cedar shakes and shingles, has adopted Haag's findings.
Mr. Madro stated, however, that Haag's findings are based on
tests done in Texas, which obviously experiences much milder
weather than does Chicago; in his opinion, Haag's findings do not
hold true in Chicago. Tr. at 415-17. Whatever the validity of
Mr. Madro's criticisms of Haag, the point is moot to some extent
because Mr. Madro testified that his knowledge about how extreme
weather swings affect the structural integrity of cedar shingles,
especially those hit by hail, was derived in the last few years,
after he assessed the Mohrs' roof. Tr. at 369-71. He testified,
in the end, however, that if the only damage to this roof had
been the white dimples or pockmarks, he would not have
recommended replacement of the roof. Tr. at 419. He testified

15

that he saw evidence of hail damage in every single ten-by-ten square on that roof, and that is why he recommended replacement. *Id.* at 421.

Significantly, Mr. Madro testified that his company worked on approximately 450 to 500 homes in the wake of the May 2000 hail storm, and that, in every case, he and his company recommended full replacement, rather than spot repairs. Tr. at 363-64. In fact, Mr. Madro specifically stated that he was "not in the repair business." *Id.* at 364.

At the close of the plaintiffs' case, AAIC moved for a directed verdict, and the Court denied the motion. Tr. at 427. AAIC then put on its case, calling just two witnesses, Randall Christensen, the adjuster who handled the Mohrs' claim, and Chris Kneppers, the roofing expert who examined the Mohrs' roof as part of the claim investigation.

Mr. Christensen testified that he is a regional general adjuster for Fireman's Fund, which means that he is charged with handling complex property claims mostly in excess of $100,000. He further testified that, in that capacity, he was responsible for processing and investigating the Mohrs' claim. Mr. Christensen testified that, after the loss was assigned to him, he arranged to go out to the house to check out the roof, and he retained an expert, Chris Kneppers of Madsen & Kneppers, to go with him. Tr. at 431-32. Mr. Christensen testified that he and

Mr. Kneppers inspected the Mohrs' roof on July 12, 2000. Initially, they walked around the house to inspect damage from ground level; from that vantage point they could see that the roof had been struck by hail and they could see hail marks on the roof. Tr. at 433. Then, Mr. Kneppers and his assistant climbed on to the roof in a couple of places to get a closer look. Throughout his inspection, Mr. Kneppers would talk to Mr. Christensen, who remained on the ground, about the damage he was finding. He showed Mr. Christensen some splits in the shingles stemming from hail impacts, as well as other splits that did not seem to be associated with any given impact. Tr. at 434.

Mr. Christensen testified that, in deciding whether to repair or replace a roof, he typically looked at how extensive the damage was. For example, if 30 or 40% of the roof was damaged, he would start to think about replacing the entire roof, given that the roofer doing the repairs is likely to cause even more damage during the repair process; he stated that, from an economic standpoint, at some point it is just worth replacing the whole roof. Tr. at 437. Mr. Christensen testified that Mr. Kneppers was going to prepare a diagram of the damaged areas of the roof, and that he would then decide whether replacement was warranted, or whether repairs were feasible; he stated that he intended to rely upon Mr. Kneppers' expertise in making this determination. Tr. at 434-36, 496.

Mr. Christensen testified that, ultimately, Mr. Kneppers prepared a report and submitted it to him, and that he then, in turn, sent it to the Mohrs' attorney. Mr. Christensen testified that he knew, pretty much from the outset, that the Mohrs' claim was likely to exceed $100,000 – in fact, he admitted that, before he ever talked to the Mohrs' attorney, he knew the Mohrs were seeking somewhere in the neighborhood of $340,000. Tr. at 474. He also admitted that he knew very early in the claims handling process that the Mohrs had set up a $400,000 escrow to cover whatever work had to be done on the roof. Tr. at 466-67.

Mr. Christensen testified, consistent with the notes he made during the claims handling process, that after inspecting the roof, he saw strong evidence of hail damage all over the entire roof. *Id.* at 475. Specifically, he saw pockmarks or white marks all over the roof, and "scattered areas contain[ing] broken or split wood shingles." *See* Tr. at 491-92; Plaintiffs' Exhibit 17, p. 17-OO. But he believed, even before he saw Mr. Kneppers' report, that a "proper repair of the roof can be made." Plaintiffs' Exhibit 17 at pp. 17-OO - 17-PP. In fact, Mr. Christensen admitted that he never considered compromising the Mohrs' claim on a replacement basis, that any settlement of the claim had to, in his mind, be based on spot repairs. Tr. at 483-84. He also admitted that, given his view of the damage, he would have been hard pressed to offer anything over $25,000. Tr.

at 480-483; Plaintiffs' Exhibit 17-U.

Mr. Christensen admitted that the Mohrs' roof was unique, Tr. at 485, yet he could not say whether anyone from Fireman's Fund had ever gone out to look at the roof, or even the house, before writing the policy; he himself did not do so. Tr. at 486. Mr. Christensen also admitted that, before the Mohrs' roof, he had never inspected a cedar roof for hail damage. *Id.* at 494.

In response to questions from the Court, the parties argued about the total number of shingles covering the Mohrs' roof. Although they couldn't agree on a specific number, they did agree that, if the number of shingles did not exceed 100,000, it was at least close to that ballpark. Tr. at 499-500. Not surprisingly, the parties did not even come close to agreement on the issue of what percentage of the total number of shingles was actually damaged by hail. Mr. Christensen estimated that the number might be 10%. Tr. at 497.

After Mr. Christensen, AAIC called its expert, Chris Kneppers, a mechanical engineer, certified professional estimator and registered roofing consultant. At the outset, it became clear that Mr. Kneppers' criteria for assessing damage differed from that of Mr. Wilkinson and Mr. Madro, whose expertise came, in counsel's words, not from book learning, but from life experience accumulated on the job. According to Mr. Kneppers, and according to a couple of engineering studies he generally

relies upon in assessing the condition of a roof, a dent or dimple caused by hail hitting a cedar shingle is not, in and of itself, damage; rather, a dent or dimple is considered damage only if the impact actually causes the shingle to split, which then leads to a risk that the roof may leak. Tr. at 511-12, 514, 518. Mr. Kneppers testified that any discoloration resulting from hail hitting a cedar roof would fade over time, over a period of a year or perhaps two years. Tr. at 518-19.

Specifically with respect to the Mohrs' house, Mr. Kneppers testified that he inspected the roof on July 12, 2000, and that, at that time, he noted damage in just a couple of areas, primarily at the ridge and in a couple of valleys. Tr. at 522. He testified that, although the roof was covered with white marks, he did not consider those marks to be damage; as noted, damage existed, in his view, only if there was a split associated with the impact, and he didn't find that. Tr. at 522. Generally, as far as hail damage, Mr. Kneppers noted deteriorated and damaged shingles in certain very specific locations on the roof, along the ridge and in areas adjacent to the tie-in, where the area covering the 1998/1999 addition met the original roof. Tr. at 523. He also noted hail damage on the southwest slope under a tree. *Id.* Mr. Kneppers testified that he had never installed a cedar shingle roof, and that he had never before inspected a thatch-style cedar roof. Tr. at 597, 612.

20

With regard to the replacement/repair determination, Mr. Kneppers testified that he generally assesses the damage in a given area, and the industry standard is a square or a ten-foot-by-ten foot area on a slope, and then compares the number of shingles that are hail damaged to the total number of shingles in the square. Tr. at 521. When there are enough shingles damaged that start approaching the replacement cost of the roof, "when you get up to about 70 or 80 . . . of the shingles in a square, you pretty much know that the roof isn't worth repairing anymore." *Id.*

Mr. Kneppers testified that, in his experience, his insurance company clients will sometimes instruct him to disregard any aesthetic issues because they do not make allowances for such issues; he testified that, in this case, he received no such instruction. Tr. at 530-31. In fact, he stated that, as far as he knew, Fireman's Fund considered aesthetic issues in making its damage assessment. Tr. at 616.

Mr. Kneppers testified that he thought the hail damage to the Mohrs' roof could be fixed for no more than $15,000. He explained that he arrived at this estimate by multiplying 7.6 squares (the area he believed needed to be repaired) by roughly $1,975 (what he characterized as a generous estimate covering the costs of labor and material necessary to repair each square). He also testified that the rules for assessing hail damage put out

21

by Haag were simply guidelines, and that in certain circum-
stances, it would be entirely proper to disregard or deviate from
them.  Tr. at 616.  He admitted that the Mohrs' roof would be
more difficult to spot repair than a regular cedar shingle roof.
Tr. at 620.  But he did not agree with Mr. Madro that it was
impossible to repair; nor did he agree that the task would be so
difficult as to be economically non-viable.  Mr. Kneppers
testified that, in his view, roughly 10 or 11% of the shingles on
this roof needed to be replaced.  Tr. at 621.  He also testified
that he would start thinking about replacing the entire roof when
the damage was closer to 20 to 25% of the shingles.  Tr. at 623.

CONCLUSIONS OF LAW

Initially, there is no question that the Mohrs' homeowner's
insurance policy was in effect at the time of the hail storm.
Fireman's Fund issued to the Mohrs Prestige Plus Homeowners
Policy Number NZF 225 12 98, on December 15, 1999.  The policy,
which was, according to Fireman's Fund, "one of the most
comprehensive homeowners policies available today," covered the
one year period ending December 15, 2000.  See Defendant's
Exhibit 35, pp. 1-2.

Nor is there any question that the policy covered roof
damage caused by hail.  The parties stipulated that the relevant
language of the policy appears in paragraph 3.d. of the section
entitled "Section I - Conditions," which governs the manner in

22

which losses are settled.  The language provides as follows:

3.    Loss Settlement

Covered property losses are settled as follows:
* * *
d.    Dwelling and other structures under Coverage
A and B; at replacement cost without
deduction for depreciation, subject to the
following;

(1)    We will pay the cost to repair or
replace with no deduction for
depreciation, but not more than the
least of the following amounts:

(a)    the limit of liability that applies
to the damaged dwelling or other
structure, plus any increase to
this limit that may apply under
Additional Coverages 14.  Full Cost
Replacement Coverage;

(b)    the replacement cost, on the same
premises, of that part of the
dwelling or other structure
damaged; or

(c)    the necessary amount spent to
repair or replace the damaged
structure.

(2)    If you chose not to repair or replace
and elect cash settlement, we will pay
the amount that equals the cost to
repair or rebuild that part of structure
damages for like construction and use on
the same premises.

AAIC argues that the "part of the dwelling" language in
paragraph d(1)(b), in this case, would be limited to that part of
the roof that was actually damaged by hail; the Mohrs disagree,
and argue that the "part of the dwelling" language refers to the
entire roof.  Cast in a slightly different way, and incorporating

23

the terminology of paragraph d(1)(c), the issue is whether it was "necessary," as the Mohrs argue, to replace the entire roof, or whether the only thing "necessary" was to repair, on a spot repair basis, only those shingles that were actually split, cracked or otherwise damaged by hail.

The policy language itself is not particularly elucidating; it provides no guidance as to whether "a roof" is one part of a dwelling or whether it can feasibly be divided up into various parts; nor does it clarify who gets to decide the "necessary amount spent to repair or replace" any given damage, or how one would go about that task. The fact that the policy language is ambiguous under these circumstances certainly counts in the Mohrs' favor. *See, e.g., Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995)(courts should construe ambiguous contract language against the interest of the party that drafted it). But, at the end of the day, a preponderance of the evidence adduced at trial does not persuade the Court that $400,000 was the "necessary amount" spent to repair or replace the roof, given the extent of the damage caused by hail.

As with most stories, the Mohrs' saga probably has three sides: the Mohrs are at one end of the spectrum, claiming that the roof had to be replaced, to the tune of $400,000; AAIC is at the other end of the spectrum, steadfastly maintaining that the roof could have been spot repaired, for $15,000 or less; and the

truth – or at least the just result – is probably somewhere in the middle. But, as a practical matter, because of the way the parties prepared and presented the case, the middleground is not an option.

During the trial, AAIC attempted to elicit testimony concerning the reasonableness of what counsel for AAIC described as the "soup to nuts" amount Cedar Roofing charged the Omvedts in connection with the re-roofing project. Counsel for the Mohrs objected, and the Court consistently sustained those objections, repeatedly shutting down AAIC's questions on the issue. The Court did so, in large part, because the issue was never raised in the Final Pretrial Order. In that document, the plaintiffs indicated that they sought $400,000 for replacement of the roof, plus fees and costs. AAIC, on the other hand, indicated that, in its view, the Mohrs were entitled to $15,000, the costs for spot or sectional repair of the roof. AAIC did not plead any alternative damages theory, and it gave no indication that it intended to challenge the reasonableness of the replacement cost, should the Court decide that replacement was necessary. Based on the Final Pretrial Order, the Court came into the trial thinking that the sole issue to be decided was whether this was a repair job or a replacement job; if the former, the plaintiffs would get $15,000; if the latter, $400,000. Indeed, at the outset of the trial, the Court specifically asked whether there were any

figures between the $400,000 number and the $15,000 number, and the parties gave no indication that they intended the Court to consider anything but those two positions. Tr. at 2.

After the trial, AAIC filed a motion asking the Court to consider an alternative replacement cost number; in its motion, AAIC suggested that, if the Court determined that replacement of the roof was necessary, AAIC should be required to pay $140,225 ($1,975 per square, times 71 squares), rather than the allegedly exorbitant amount authorized by the Omvedts. The Court heard AAIC's motion on February 20, 2004. At the hearing, counsel for the Mohrs opposed the motion for, essentially, the same reasons offered at trial – namely, that the issue wasn't pled in the Final Pretrial Order, and that, as a result, AAIC should not be permitted to spring it on them, and on the Court, at such a late date. The Court agreed, and declined to reconsider its ruling at trial that such evidence should be precluded. The upshot of these rulings is that the case will ultimately turn on whether the Mohrs have proved, by a preponderance of the evidence, that replacement of the entire roof was necessary. If they meet this burden, they will be entitled to an award of $400,000; if not, they will be entitled to an award of $15,000.

Turning to the evidence of damage, the Court first notes that counsel for AAIC spent a great deal of time at trial asking the expert witnesses about the damage purportedly evident in

various sets of photographs taken of the house.  Generally, based solely on the photographs, there were few instances where a witness could say with any certainty that a particular spot constituted hail damage.  But this line of questioning would seem to be entirely irrelevant.  None of the experts based his damage assessment on the photographs; rather, each personally inspected the house, and each based his findings on his first-hand observations.  Accordingly, it is of no moment that the photographs do not reveal concrete evidence of hail damage.  In assessing whether any given split or crack was caused by the hail, everyone agreed that one would have to look at the color of the wood inside the crack or split: if it was fresh, the crack or split was likely caused by hail; if it was weathered to the same degree as the area around the crack or split, the damage must have existed before the hail storm.  With a few exceptions, the photographs simply do not show the wood with the degree of clarity necessary to assess the condition and color of the wood. Thus, any assessment of hail damage would have to come from the on-sight inspections, and not from the photographs, and so the Court is left to rely, for the most part, on the witnesses' descriptions of what they saw when they went to the house, and on the Court's assessment of whether those descriptions are credible.

Generally speaking, the Mohrs' assessment of the damage

caused solely by the hail storm is consistent with that given by
Mr. Kneppers. All three agreed that the predominant issue was
the pockmarks or the discoloration, and all three noted that the
other damage – the missing shingles, the cracked or split
shingles – was largely limited to a relatively small number of
specifically definable areas. Mr. Mohr testified that he saw a
relatively small number of shingles on the ground, and that he
noticed broken shingles along the edge of the house; Mrs. Mohr
testified that she saw cracked or missing shingles on the back
side of the house, high up on the roof. Although they are by no
means experts in assessing hail damage, the Mohrs were obviously
in the best position to notice the changes in the roof that
existed immediately after the hail storm; having seen the roof on
pretty much a daily basis, they would seem to be the best judges
of what damages could specifically be attributable to the hail,
and what damages might already have existed on the roof at the
time of the storm. Mr. Kneppers, who, unlike the Mohrs, *is* an
expert in assessing hail damage, noted damage in basically the
same areas flagged by the Mohrs, as well as at least one other
area under some tree branches. The Court credits the testimony
of all three of these witnesses with respect to the damage on the
roof that was directly attributable to the hail storm.

The Court is inclined to give less weight to the damage
assessment articulated by Mr. Wilkinson for a couple of reasons.

First, Mr. Wilkinson was hired by Craig Omvedt to assess the condition of the roof; Mr. Omvedt never asked him to limit his findings to damage that could be traced directed to the hail, because that wasn't really Mr. Omvedt's concern. Mr. Omvedt did not care what caused the damage; he just wanted to know whether he should replace the roof. And, although he denied it at trial, the Court is persuaded that Mr. Omvedt never would have considered a spot repair of his roof. The roof had already been in place for more than 20 years when the storm hit, and, in that time, it had obviously sustained some degree of damage through wear and tear. Randall Christensen, who met Mr. Omvedt when he went to inspect the roof, had the distinct impression that Mr. Omvedt was hell-bent on replacing the roof, regardless of what was reasonable or necessary, and regardless of what the Mohrs, or their insurer, thought was appropriate. And Mr. Wilkinson, who worked closely with Mr. Omvedt - closer than he would have liked apparently - during the roof replacement project, testified that Mr. Omvedt had very clear ideas on what he did and did not want; he testified that every time he discussed the project with Mr. Omvedt, the price went up, as he tried to accommodate his many demands and specifications.

From what the Court saw at trial, Mr. Christensen's and Mr. Wilkinson's impressions of Mr. Omvedt seem to be about right. At trial, Mr. Omvedt appeared to be as fastidious as Mr. Wilkinson

had made him out to be. Comparing their testimony, mannerisms, appearances and demeanors, the Court has no difficulty in concluding that Mr. Omvedt and Mr. Mohr would have had very different thresholds for what would be aesthetically acceptable in this roof. Whereas Mr. Mohr indicated that he was willing to live with white spots on his roof for a time, Mr. Omvedt would not have been; whereas Mr. Mohr indicated that he was willing to tolerate having new shingles interspersed with weathered shingles (the patchwork appearance some of the witnesses described), Mr. Omvedt would never have tolerated this. In the Court's estimation, Mr. Omvedt saw in the hail storm an opportunity to get a new roof, at the Mohrs' expense, and he took full advantage of it. The Mohrs, having already moved to the east coast, were in no position to refuse him on the escrow. To be sure, they could have found a new buyer for their home and started the whole process all over again, but not without losing even more money in the interim. And Mr. Omvedt no doubt knew as much. All of this is an aside, of course, because Mr. Omvedt's conduct is not really before the Court. But this bit of insight into his conduct is important because it surely affected Mr. Wilkinson's assessment of the condition of the roof, and ultimately, it affects what weight the Court assigns to that assessment.

None of this is to say that Mr. Wilkinson's recommendation to replace the roof was wrong or even unreasonable. The roof had

last been replaced in the 1970s, and it unquestionably had sustained damage, some related to the hail storm, and some not related to the hail storm. But the question before the Court is whether AAIC is obligated, under its contract with the Mohrs, to pay $400,000 to replace the roof. And that question is much more narrow than the question asked of Mr. Wilkinson. To that extent, Mr. Wilkinson's assessment of the damage is entitled to less weight.

Additionally, to the extent Mr. Wilkinson indicated that the pockmarks themselves constituted damage, the Court rejects that notion. Everyone agreed that the marks would fade over time, and everyone but Mr. Wilkinson flat out said that they would all but disappear as part of the natural weathering process. Thus, even though aesthetics was an important part of the equation with this roof, the pockmarks, by themselves, would not have made the $400,000 replacement necessary.

The Court does credit, to a greater extent, the testimony of Mr. Madro, the Mohrs' other roofing expert. At trial, counsel for AAIC attempted to discredit Mr. Madro by pointing out that he has no formal education in assessing cedar shingle roofs or in assessing what is and what is not hail damage on a cedar shingle roof. But given Mr. Madro's vast experience, the Court is not at all troubled by his lack of formal training. As counsel for the Mohrs pointed out, expertise acquired through real world

31

experience and on the job training can be - especially in a case like this - every bit as important as, or more important than, formal education.

Having said that, the Court nonetheless finds that Mr. Madro's assessment of the damage is entitled to less weight than Mr. Kneppers' assessment for two main reasons. For starters, Mr. Kneppers inspected the roof in July, just two months after the storm and before Cedar Roofing had spent much time on the roof. In contrast, Mr. Madro inspected the roof in October, five months after the storm, after Mr. Kneppers and Mr. Wilkinson and his crews had crawled all over the roof, and after Cedar Roofing had started its replacement project. Given that all of the experts agreed that foot traffic and roof repair projects cause some measure of damage beyond that already existing on the roof, it is possible - even likely - that at least some of the fresh cracks and splits Mr. Madro found developed after the hail storm.

More importantly, Mr. Madro himself admitted that he was not inclined - ever - to recommend spot repairs for hail damage on a roof of this type. Thus, the fact that he did not do so in this case is not particularly telling. He indicated that, in his view, spot repairs were problematic, at least in part, because they produced a patchwork effect, with the new shingles standing out like a sore thumb amongst the old, weathered shingles. But Mr. Kneppers testified that the new shingles would quickly

32

weather – their "patina" will fade to more closely match that of the existing shingles, within a year or so. See, e.g., Tr. at 548. Moreover, the Mohrs did not seem to mind the patchwork; indeed, they demonstrated a clear willingness to live with that effect when they repaired or replaced small sections of their roof at various times during the decade or so that they lived in the house. As noted, Mr. Omvedt surely would have agreed with Mr. Madro that the patchwork was unacceptable. But in deciding what is or is not necessary in terms of repairs, Mr. Omvedt's notions of what is acceptable aesthetically are irrelevant, because he is not a party to the contract between the Mohrs and AAIC.

For purposes of this dispute, which, after all, centers on the interpretation of an insurance contract, Mr. Madro placed too much emphasis on aesthetics. The Court appreciates that Mr. Madro is a master in his craft, no doubt striving for perfection in each of the roofs he installs. But the contract does not contemplate aesthetic perfection, and, as the Court has already noted, aesthetic damage alone would not satisfy the "necessary" requirement in the policy. Mr. Madro himself seemed to recognize as much when he admitted that, if the pockmarks had been the only damage, he would not have recommended replacement of the roof. Yet, curiously, he recommended that the copper ridge be replaced, even though the only damage to that ridge was cosmetic. Mr.

33

Kneppers, who also noted the cosmetic damage to the ridge, did not think the ridge needed to be replaced. Given that the ridge is barely visible from the ground, and given that the record contains no evidence suggesting that the dings in the ridge impaired its function or otherwise compromised the structural integrity of the roof, the Court is unable to conclude that the costs incurred in replacing the ridge were "necessary." The fact that Mr. Madro thought they were reflects on his credibility.

Similarly, to the extent the Mohrs intended to show that the "patchwork" effect caused by spot repairs could compromise the roof's functionality, there is simply no evidence to back up that assertion. Despite the various "spot repairs" done on the home over the years, there is no evidence that those repairs ever produced any leaks or otherwise compromised the roof. Nor is there any evidence to suggest that the resulting patchwork effect lowered the value of the home. On the contrary, despite the variations in color in the shingles, the Mohrs still stood to make more than a million dollars on the sale to the Omvedts, even after the escrowed funds were taken out. And, in fact, Mr. Madro never testified that spot repairs would increase the likelihood of leaks or decrease the value of the home. He said simply that the roof would be "unwarrantable," and there is nothing in the record to suggest that the Mohrs cared one wit about a warranty; to the contrary, they testified that they did not think the roof

was covered by any warranty in the first place.

For all of these reasons, on the question of the extent of damage caused by the hail storm, the Court credits the testimony of AAIC's expert over that of the Mohrs' experts. Based on its view of the evidence and testimony, the Court finds that approximately 10% of the shingles on this roof sustained hail damage. This finding is consistent with what the Mohrs saw on the roof, and with what Mr. Christensen and Mr. Kneppers saw on the roof. And, actually, it is consistent with what Mr. Wilkinson reported finding on the roof. He stated that his crews generally found, at most, 20 damaged shingles per square, which translates to about 5% of the shingles on the roof, assuming 400 shingles per square.[5] Based on the expert testimony, damage covering 10% of the roof would not warrant replacement of the entire roof. Indeed, the only evidence on this issue came from AAIC's witnesses, who testified that they would not think seriously about replacing the entire roof unless they saw damage in at least 20% of the shingles on the roof. The evidence does not support a finding that that many shingles sustained hail damage here. In short, the Mohrs failed to show that replacement

---

[5]Mr. Kneppers testified that there are 400 to 600 shingles per square, and that testimony is unrebutted in the record. To be fair, Mr. Wilkinson did say that they saw a far greater number of shingles damaged near the ridge. But he did not elaborate on the numbers, and so the Court is unable to infer much from that statement.

of the entire roof was necessary. Certainly, in the parlance of the policy, they failed to show that $400,000 was the "necessary amount spent to repair or replace the damaged structure."

Having said all of this, the Court is equally convinced that $15,000 is far less than the "necessary amount spent to replace or repair" the roof, even if repairs had been made on a spot repair basis. On the question of what it would take to fix this roof, the Court credits the testimony of Mr. Madro and Mr. Wilkinson over that of Mr. Kneppers, who was almost dismissive about the intricacy and complexity of the work required to repair even the limited amount of hail damage done to this unique, and truly awesome roof. And, although the Court rejects the argument that the repair job was so complex as to make replacement necessary, it recognizes that Mr. Madro and Mr. Wilkinson, who both had extensive personal experience working with this type of roof, probably had a tighter grasp on what would have been involved in the project. The alternative number proposed by AAIC in its post-trial motion, is probably a lot closer to the mark than the $15,000 AAIC offered throughout the case. But, as explained above, the way in which the parties presented the case prevents the Court from delving too deeply into what this job *should have* cost. The Mohrs, having successfully objected to the introduction of evidence on this issue at trial, and having opposed a post-trial motion on the issue, have effectively waived

the right to any award between $15,000 and $400,000.  Thus, on
Count One of their Complaint, the Mohrs are entitled to just
$15,000.

As a practical matter, the Court's findings and conclusions
on Count One of the Complaint necessarily resolve the Mohrs'
breach of contract claim; the evidence does not establish that
AAIC failed to live up to its obligations under the policy.
Similarly, the Court's findings and conclusions above resolve the
Mohrs' claim that AAIC acted vexatiously and unreasonably, in
violation of §155 of the Illinois Insurance Code.  That section
provides that an award of attorneys fees and other costs is
appropriate if the insurers' actions are "vexatious and
unreasonable." 215 ILCS 5/155 (West 1999).  An insurer's conduct
is not "vexatious and unreasonable" if, among other things,
"there is a bona fide dispute concerning the scope and
application of insurance coverage . . . ." *Citizens First
National Bank of Princeton v. Cincinnati Insurance Co.*, 200 F.3d
1102, 1110 (7th Cir. 2000).  As the Court indicated at trial, and
as evidenced by the findings in this opinion, the parties here
had a bona fide dispute about the scope of the coverage provided
in the Mohrs' policy.  Accordingly, the Court finds in favor of
AAIC on the §155 claim.

In sum, having considered the evidence presented, the Court
finds that the Mohrs' homeowners insurance policy, Prestige Plus

37

Homeowners Policy Number NZF 225 12 98, was in effect on May 17, 2000, and that any damage their roof sustained as a result of the hail storm that hit Lake Forest on that day was covered under that policy. The Court further finds, however, that the Mohrs failed to prove, by a preponderance of the evidence, that the $400,000 they incurred to replace the roof was the "necessary amount spent to repair or replace the damaged structure." Finally, the Court finds that the evidence does not support the Mohrs' breach of contract and §155 claims.

Accordingly, on Count One of the Complaint, the Clerk is directed to enter judgment in favor of the Mohrs in the amount of $15,000. On Counts Two and Three of the Complaint, the Clerk is directed to enter judgment in favor of AAIC.

Dated: March 4, 2004

ENTER:

ARLANDER KEYS
United States Magistrate Judge